UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BAR INDY LLC, REVEL BAR INDY LLC, ISENTARK ENTERTAINMENT, LLC, BEMBARS, INC., R&D COMPANIES, INC., WHISTLE STOP INN INC., CLASSIC 46, INC., NEW JOURNEY, LLC, I2V, LLC, KORE ENTERPRISES, INC., BASEY LLC, MILO ENTERTAINMENT LLC, 5135 HOLDINGS INC., D&D LUGAR INC., and TAD INDY INC., | ) ) ) ) ) ) ) ) ) ) | |
| | ) ) | |
| *Plaintiffs*, | ) ) | |
| vs. | ) ) ) | 1:20-cv-02482-JMS-DML |
| CITY OF INDIANAPOLIS, JOE HOGSETT, *in his official capacity as Mayor of Indianapolis*, MARION COUNTY PUBLIC HEALTH DEPARTMENT, and DR. VIRGINIA CAINE, *in her official capacity as Director and Chief Medical Officer of the Marion County Health Department*, | ) ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) | |

## ORDER

Pending before the Court is a Motion to Remand, [Filing No. 12], filed by Plaintiffs who are fifteen companies and corporations who own bars and nightclubs in Marion County, Indiana. Plaintiffs ask the Court to return this matter to the Marion Superior Court following its removal to this Court by Defendants the City of Indianapolis, Indianapolis Mayor Joe Hogsett, the Marion County Public Health Department (the "MCPHD"), and Dr. Virginia Caine, who is the director and chief medical officer of the MCPHD.  Also pending before the Court is Plaintiffs' Motion for Preliminary Injunctive Relief.  [Filing No. 17.]  These motions are now ripe for the Court's decision.

# I.
## BACKGROUND

### A.      The COVID-19 Pandemic

As the Seventh Circuit noted in a recent decision, "COVID-19 requires no introduction." *Mays v. Dart*, 974 F.3d 810, 814 (7th Cir. 2020).  "[T]he novel coronavirus causing this disease has spread around the world, resulting in an unprecedented global pandemic that has disrupted every aspect of public life." *Id.*  The virus transmits from person to person, "primarily through respiratory droplets" that can "remain in the air for several hours, and also through lingering particles on surfaces." *Id.*  According to recent data from the Centers for Disease Control and Prevention (the "CDC"), as of December 21, 2020, more than 464,000 Hoosiers have been infected by the novel virus,[1] and more than 7,400 have died.[2]  Marion County has seen more than 63,000 cases and more than 1,000 deaths.[3]  As demonstrated by the CDC chart below, Indiana has seen a precipitous increase in the number of COVID-19 cases in recent months.[4]

---

[1] *See* https://covid.cdc.gov/covid-data-tracker/#cases_totalcases (last accessed Dec. 21, 2020).  The Court takes judicial notice of the data on the CDC website.  Fed. R. Evid. 201.  *See also Bodnar v. Lake Cty. Jail*, 2020 WL 1940742, at *2 (N.D. Ind. Apr. 22, 2020) (taking judicial notice of CDC guidelines for managing COVID-19 in jails and prisons).

[2] https://covid.cdc.gov/covid-data-tracker/#cases_totaldeaths (last accessed Dec. 21, 2020).

[3] https://covid.cdc.gov/covid-data-tracker/index.html#county-map (last accessed Dec. 21, 2020).

[4] https://covid.cdc.gov/covid-data-tracker/#compare-trends_newcases (last accessed Dec. 21, 2020).

**New cases of Covid-19, reported to CDC, in IN**

Seven-day moving average of new cases, by number of days since 10 average daily cases first recorded.



### B.    The Gubernatorial Orders

To mitigate the spread of the COVID-19 virus, Indiana Governor Eric Holcomb declared a public health emergency, [Filing No. 14-1], and issued Executive Order 20-04, which effectively ordered all bars, nightclubs, and restaurants in the state to be closed to in-house patrons beginning March 16, 2020, [Filing No. 14-2 at 3].  Governor Holcomb subsequently issued Executive Order 20-32, which, starting June 12, 2020, enabled bars and nightclubs to reopen under certain restrictions, including limiting occupancy to 50%.  [Filing No. 16-2 at 7.]  Restaurants were permitted to open at 75% occupancy, but bar areas within restaurants were limited to 50% occupancy.  [Filing No. 16-2 at 7.]  Governor Holcomb further eased restrictions starting on September 26, 2020, with Executive Order 20-43, which rescinded the occupancy limits previously imposed on bars and restaurants and replaced them with the requirement that "seating must be

arranged and maintained so that individuals, households, or parties are spaced at least six feet apart." [Filing No. 16-1 at 8.] The Executive Orders made clear that local health departments maintained their authority to impose additional restrictions:

> Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing the State, any local health department, or any other proper entity from ordering: (a) any quarantine or isolation that may require an individual to remain inside a particular residential property or medical facility for a limited period of time including the duration of this public health emergency; or (b) any closure of a specific location for a limited period of time, including the duration of this public health emergency.

[Filing No. 16-1 at 10; Filing No. 16-2 at 12.]

**C.** **The MCPHD Orders**

To mitigate the spread of the virus, the MCPHD, through Dr. Caine as its director and chief medical officer, has issued (and continues to issue) additional restrictions through Public Health Orders applicable to individuals and businesses in Marion County. [*See, e.g.*, Filing No. 14-3; Filing No. 14-4; Filing No. 14-5; Filing No. 14-6; Filing No. 14-7.] Each order relevant to this case cited Indiana Code § 16-20-1-24 and Chapter 7, Article 5 of the Code of the Health and Hospital Corporation of Marion County, Indiana (the "Health & Hospital Code") as providing the MCPHD the authority to issue the order. [*See* Filing No. 14-3 at 2; Filing No. 14-4 at 2; Filing No. 14-5 at 2; Filing No. 14-6 at 2; Filing No. 14-7 at 2.] Some of the Public Health Orders address the operations of bars, nightclubs, and restaurants in Marion County, including the orders described below.

*1. Public Health Order 22-2020*

Even though Executive Order 20-32 enabled bars and restaurants to open at 50% capacity starting in June 2020, the MCPHD issued Public Health Order 22-2020 ("Order 22-2020"), which, effective July 24, 2020, closed "bars and nightclubs" in Marion County. [Filing No. 14-3 at 7.]

Order 22-2020 defined bars and nightclubs as "all indoor establishments that serve alcoholic beverages for consumption on the premises and/or that cater to dancing or social interactions among patrons, other than a restaurant or club." [Filing No. 14-3 at 7.] Restaurants, on the other hand, were permitted to remain open for indoor dining, but capacity was restricted to 50% and six feet of social distancing was required. [Filing No. 14-3 at 6.] Among other restrictions, restaurants were also required to close by midnight and "[a]ll bar seating within restaurants" was to "be closed at all times." [Filing No. 14-3 at 6.] In addition, all live entertainment at restaurants was prohibited. [Filing No. 14-3 at 6.]

### 2. Public Health Order 25-2020

The MCPHD subsequently issued Public Health Order 25-2020 ("Order 25-2020"). [Filing No. 14-4.] Order 25-2020 clarified the definition of bars and nightclubs, which Order 22-2020 had ordered closed. It clarified that "bars and nightclubs" included "any establishment that met the definition of a bar or nightclub as of March 1, 2020," and further clarified that "[b]ars and nightclubs are defined as all indoor establishments that serve alcoholic beverages for consumption on the premises, restrict the age of patrons to 21 years or older, and/or that cater to dancing or social interactions among patrons, other than a restaurant or club." [Filing No. 14-4 at 7.] Order 25-2020 reiterated that "[a]ll separate bar areas in full service restaurants must remain closed." [Filing No. 14-4 at 7.]

### 3. Public Health Order 29-2020

The MCPHD's Public Health Order 29-2020 ("Order 29-2020") became effective on September 8, 2020. [Filing No. 14-5.] Order 29-2020 permitted bars and nightclubs in Marion County, which had been closed since July 24, 2020, to reopen "at 25% capacity for indoor seating and 50% capacity for outdoor seating." [Filing No. 14-5 at 6-7.] Furthermore, "[a]ll bar-top

seating" was to remain closed, "but tables within the bar area may be open for table service," live entertainment was still prohibited, and dance floors were to remain closed. [Filing No. 14-5 at 7.] Order 29-2020 further clarified that Gentlemen's and Ladies' Clubs would be considered "bars" for purposes of Order 29-2020, as would hookah and cigar bars. [Filing No. 14-5 at 7.]

Order 29-2020 also contained some new directives for restaurants. Restaurants that are "not age-restricted" could remain open for indoor dining at 50% capacity and outdoor dining at 75% capacity. [Filing No. 14-5 at 5-6.] Restaurants that "are restricted to 21 years of age and older" were limited to 25% capacity for indoor dining and 75% capacity for outdoor dining. [Filing No. 14-5 at 5-6.] As with bars and nightclubs, "[a]ll bar-top seating within all restaurants must be closed at all times, but tables within the bar area may remain open for table service." [Filing No. 14-5 at 6.] Likewise, live entertainment was prohibited. [Filing No. 14-5 at 6.]

### 4. *Public Health Order 31-2020*

Effective September 28, 2020, MCPHD Public Health Order 31-2020 ("Order 31-2020") further lifted some of the restrictions on bars, nightclubs, and restaurants. [Filing No. 14-6.] Order 31-2020 stated that bars, nightclubs, and restaurants were permitted to open at 50% indoor capacity and 100% outdoor capacity, subject to six-feet distancing between tables. [Filing No. 14-6 at 6.] Order 31-2020 continued the prohibition on bar service and bar-top seating, and required all bars, nightclubs, and restaurants to remain closed between the hours of midnight and 5:00 a.m. [Filing No. 14-6 at 6.] Restaurants, bars, and nightclubs were permitted to host live entertainment, so long as there was at least ten feet between performers and patrons and six feet between each performer. [Filing No. 14-6 at 7.]

### 5. *Public Health Order 33-2020*

The MCPHD then issued Public Health Order 33-2020 ("Order 33-2020"), which took effect on October 2, 2020. [Filing No. 14-7.]  The limitations for bars, nightclubs, and restaurants in Order 33-2020 were identical to those contained in Order 31-2020, except that bar tops could now be used to serve carry-out "so long as there is a plexiglass partition between the server and the patron." [Filing No. 14-7 at 6.]

### 6. *Public Health Orders 35-2020 and 38-2020*

After the briefing on the pending motions addressed in this Order was complete, the MCPHD issued Public Health Order 35-2020 ("Order 35-2020"), which modified Order 33-2020 and became effective on November 16, 2020.  *Available at* "Public Health Orders," http://marionhealth.org/homeslider/latest-on-coronavirus/ (last accessed Dec. 17, 2020).[5]  Order 35-2020 was subsequently replaced by Public Health Order 38-2020 ("Order 38-2020") on December 14, 2020, which made no substantive changes to the restrictions implemented by Order 35-2020 on bars, nightclubs, and restaurants.  *Id.*  Order 38-2020 is the current operative health order for bars, nightclubs, and restaurants.  Noting the "recent increase of new cases locally and nationwide with a trend toward cases in a younger population," Order 35-2020 requires bars and nightclubs to lower capacity to 25% indoors, while retaining 100% capacity outdoors.  *Id.*  Under Orders 35-2020 and 38-2020, restaurants are permitted to remain at 50% capacity for indoor service and 100% capacity for outdoor service.  *Id.*  Bars, nightclubs, and restaurants must close by midnight.  *Id.*  All occupancy limits also incorporate the requirement that tables be at least six

---

[5] The Court takes judicial notice of subsequently issued public health orders.  *See* Fed. R. Evid. 201.  All public health orders issued in response to COVID-19 are available for download at the above stated link to the MCPHD's website.

feet apart.  *Id.*  Bar tops remain closed but carry-out service with appropriate partitions is permitted. The orders further clarified that "[o]utdoor tent seating is permitted only if the tent has at least two (2) open-air sides for maximum ventilation." *Id.*

### C.    Impact on Plaintiffs' Businesses

Plaintiffs—owners of bars and nightclubs located in Marion County—assert they have suffered immensely as a result of the orders issued by the Governor and the MCPHD.  [*See* Filing No. 1-2 at 44-82 (affidavits from the owners of Plaintiffs).]  Plaintiffs have been negatively impacted by the MCPHD orders, in particular Order 22-2020, which effectively shuttered bars and nightclubs from July 24 until September 8 when Order 29-2020 permitted reopening.  Additional restrictions on occupancy, the prohibition of bar seating, the midnight closure requirement, and the prohibition of live entertainment and dancing also harmed Plaintiffs' businesses.  [*See, e.g.*, Filing No. 1-2 at 48; Filing No. 1-2 at 53; Filing No. 1-2 at 75.]

For example, Plaintiff MILO Entertainment LLC owns The Red Room, which is an age-restricted establishment that serves both food and alcohol and typically operates between 8:00 p.m. and 3:00 a.m.  [Filing No. 1-2 at 74.]  Because of COVID-19 and the virus-related orders, "The Red Room's revenue is down by 65% since last year."  [Filing No. 1-2 at 74.]  While The Red Room "ha[s] been utilizing [its] outdoor rooftop to accommodate social distancing, this has largely been dependent on weather and will be an unsustainable approach for the coming seasons."  [Filing No. 1-2 at 74.]  "Capacity restrictions have taken business away from The Red Room to establishments outside of Marion County," and because "[t]he landlord of the property has a mortgage," The Red Room "is only receiving limited assistance."  [Filing No. 1-2 at 74.]  The owner of The Red Room states that "[w]ithout immediate relief or additional assistance, The Red Room could face permanent closure."  [Filing No. 1-2 at 74.]  Likewise, Plaintiff Kore Enterprises,

Inc., which owns and operates three bars—Average Joe's Sports Pub, Rock Lobster, and Mineshaft Saloon—has also suffered.  [Filing No. 1-2 at 68.]  "As a result of the pandemic and subsequent orders, . . . Average Joe's, Rock Lobster, and Mineshaft Saloon have experienced extreme financial difficulties.  As of September 1st, 2020, Average Joe's sales are down by $225,500, Rock Lobster's sales are down by $455,000, and Mineshaft Saloon's sales are down by $54,500."  [Filing No. 1-2 at 68.]  Each of the Plaintiffs have faced similar plights with their businesses being upended and devastated as a result of COVID-19.

### D.     Plaintiffs' Complaint

Plaintiffs filed this action on September 22, 2020 in Marion Superior Court against the MCPHD, Dr. Virginia Caine, in her capacity as the director and chief medical officer of the MCPHD, the City of Indianapolis, and Indianapolis Mayor Joe Hogsett.  [Filing No. 1-2.] Plaintiffs' Complaint (filed before some of the more recent orders) challenges the MCPHD orders on numerous fronts, alleging the following claims:

(1) Order 29-2020 violates the Indiana Constitution, Article 1, § 23;

(2) Orders 22-2020, 25-2020, and 29-2020 violate the Indiana Constitution, Article 1, § 21;

(3) Orders 22-2020, 25-2020, and 29-2020 violate the Indiana Home Rule Act, Ind. Code § 36-1-3-8;

(4) Orders 22-2020, 25-2020, and 29-2020 violate the Takings Clause in the Fifth Amendment of the U.S. Constitution, giving rise to a claim under 42 U.S.C. § 1983;

(5) Orders 22-2020, 25-2020, and 29-2020 violate Plaintiffs' substantive due process rights under the U.S. Constitution, giving rise to a claim under 42 U.S.C. § 1983;

(6) Orders 22-2020, 25-2020, and 29-2020 violate Plaintiffs' procedural due process rights under the U.S. Constitution, giving rise to a claim under 42 U.S.C. § 1983; and

      (7) Orders 22-2020, 25-2020, and 29-2020 violate the Equal Protection Clause in the Fourteenth Amendment of the U.S. Constitution, giving rise to a claim under 42 U.S.C. § 1983.

[Filing No. 1-2 at 31-40.]   Plaintiffs also bring a claim for declaratory judgment seeking declarations that:

      (1) "Orders 22-2020, 25-2020, and 29-2020 are in violation of the Indiana Constitution under: ARTICLE 1 § 21 (taking of property without just compensation), § 23 (equal privileges and immunities) and § 25 (takings effect clause), ARTICLE III § 1 (distribution of powers), and ARTICLE 4 § 1 (legislative authority vested in the General Assembly)";

      (2) "Orders 22-2020, 25-2020, and 29-2020 are in violation of Plaintiffs' right to equal protection of the law as guaranteed by the United States Constitution"; and

      (3) "Orders 25-2020 and 29-2020 are in violation of Plaintiffs' right to property under the Indiana and Federal Constitution."

[Filing No. 1-2 at 40.]   Plaintiffs also request injunctive relief, asking for an order "preventing Defendants from enforcing any restriction in . . . Orders 22-2020, 25-2020 and 29-2020 and [from] issuing any further orders which violate Plaintiffs' rights." [Filing No. 1-2 at 41.]

      Defendants removed the action to this Court on September 25, 2020, citing 28 U.S.C. § 1331 as the basis for the Court's jurisdiction because some of Plaintiffs' claims "aris[e] under the Constitution, laws, or treaties of the United States." [Filing No. 1 at 3.]  Defendants also assert that this Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a).  [Filing No. 1 at 3-4.]  Plaintiffs then filed a Motion to Remand, asking the Court to return the state-law claims to Marion Superior Court.  [Filing No. 12.]  Plaintiffs also renewed the Motion for a Preliminary Injunction that they had previously filed in state court.  [Filing No. 17.]

## II.
### MOTION TO REMAND

#### A.    Legal Standard

Under 28 U.S.C. § 1441(c), a case with both federal and state-law claims may be removed from state to federal court if the case could have been brought originally in federal court without the state-law claims.  This is so because district courts exercise supplemental jurisdiction over the state-law claims.  *See* 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III.").  When federal and state claims "derive from a common nucleus of operative facts and are so related that they form part of the same case or controversy, the accompanying state law claims fall within the supplemental jurisdiction of the court." *Fowler v. Evansville Convention & Visitors Bureau*, 2010 WL 4291298, at *2 (S.D. Ind. Oct. 22, 2010).

#### B.    Discussion

Plaintiffs concede that this Court has federal question jurisdiction over their 42 U.S.C. § 1983 constitutional claims and supplemental jurisdiction over their state-law claims under 28 U.S.C. § 1367(a) because they are part of the same controversy involving the same facts.  [Filing No. 15 at 2-3; Filing No. 25 at 1.]  However, Plaintiffs ask the Court to exercise its discretion and remand the claims arising under state law pursuant to 28 U.S.C. § 1367(c).  [*See* Filing No. 15 at 8-9.]  Plaintiffs contend that their Complaint "addresses a unique circumstance in the history of [Indiana's] jurisprudence.  Never before have local health officials, in the interest of the public health, implemented such drastic and sweeping measures for so long a period of time, based on so limited authority, with so few checks and balances, as is the case in this year's pandemic." [Filing

11

No. 12 at 5-6.]  Therefore, Plaintiffs argue, the state-law claims should be remanded back to state court because "[d]etermining the extent of the power of the [MCPHD] to issue these Orders is an issue best decided in Indiana's trial and appellate [c]ourts."  [Filing No. 12 at 6.]  Plaintiffs further argue that their state-law claims predominate over their claims anchored in the U.S. Constitution because their federal claims ultimately hinge on interpretation of state laws and regulations. [Filing No. 15 at 8.]  They contend that "[t]he issue at the heart of this lawsuit is 'How long and to what extent can Dr. Caine and the [MCPHD] continue to exercise unfettered power to regulate all business in Marion County based on Indiana Code § 16-20-1-24?'"  [Filing No. 15 at 5.]  Plaintiffs argue that they "are challenging the legality of the application of Indiana law and constitutionality of the application of those laws under the Indiana and federal constitutions," and further, it is the state-law claims that "are predominantly requesting injunctive and declaratory relief," while the § 1983 claims are "primarily to seek damages and attorney fees."  [Filing No. 15 at 9.]

In response, Defendants[6] argue that a "constitutional challenge of a government official's statutory authority is not novel" and a federal court "is no stranger to these sorts of challenges." [Filing No. 19 at 4.]  Defendants further note that within the context of the current pandemic, "[o]ther federal courts have assessed whether measures imposed to limit the spread of COVID-19 violated state law."  [Filing No. 19 at 5 (collecting cases).]  Defendants argue that federal courts routinely interpret Indiana's statutes and Constitution without the benefit of prior interpretations from Indiana courts.  [Filing No. 19 at 5-7.]  Defendants also argue that Plaintiffs' state-law claims do not predominate over the federal claims because the conduct forming the basis of the federal

---

[6] Defendants MCPHD and Dr. Caine filed a Response to Plaintiffs' Motion to Remand, [Filing No. 19], in which Defendants the City of Indianapolis and Mayor Hogsett joined, [Filing No. 21].

claims is the same conduct forming the basis of the state-law claims.  [Filing No. 19 at 8.]  Finally, Defendants argue that "the values of economy, convenience, fairness, and comity" weigh in favor of the Court retaining jurisdiction over the state-law claims because otherwise the MCPHD would be subject to duplicative proceedings at a period when its time and resources are already wearing thin.  [Filing No. 19 at 9-10.]  Defendants contend that in light of removal, "this Court is the *only* court that can hear all of the issues and resolve all of the claims in a single case.  If the state law claims are remanded, MCPHD will be forced to expend its vital resources, in the midst of a pandemic, defending against two simultaneous, duplicative lawsuits over the exact same factual allegations."  [Filing No. 19 at 9 (emphasis original).]

In reply, Plaintiffs reiterate their contention that this case will require novel interpretations of Indiana law, therefore a remand of the state claims is appropriate.  [Filing No. 25 at 2.]  They also note that at least one federal court in Michigan considering the extent and legality of a governor's orders issued in response to the COVID-19 pandemic certified questions involving interpretation of state law to the Michigan Supreme Court.[7]  [Filing No. 25 at 2-3 (citing *Midwest Inst. of Health PLLC v. Whitmer*, 2020 WL 3248785 (W.D. Mich. June 16, 2020)).]  They also respond to Defendants' complaints about the inefficiencies of litigating in multiple courts by pointing out that it was Defendants' "choice to remove the case from state to federal court," and thus "accept the possibility that the state claims could be remanded."  [Filing No. 25 at 5.]  Plaintiffs further argue that it will ultimately be more efficient to have a state court decide the issues of state law in order to create binding precedent that will "alleviate the likelihood of further similar challenges to MCPHD orders being filed in state court."  [Filing No. 25 at 6.]

---

[7] While the Court finds certification to the Indiana Supreme Court under Ind. App. R. 64 unnecessary at this preliminary stage, certification remains an option as this litigation proceeds.

District courts have discretion under 28 U.S.C. § 1367(c) to decline to exercise supplemental jurisdiction that they otherwise possess.  That section lists four instances in which courts may decline to exercise supplemental jurisdiction over a state-law claim:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  "While a district court may relinquish its supplemental jurisdiction if one of the conditions of § 1367(c) is satisfied, it is not required to do so. . . . A district court deciding whether to retain jurisdiction pursuant to the factors set forth in § 1367(c) should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008) (internal quotation marks and citations omitted).

### 1. Plaintiffs' State-Law Claims

The analysis under § 1367(c) focuses on the contours of the state-law claims.  The nature of each state-law claim pled or asserted by Plaintiffs in this lawsuit is addressed below.

#### a. Indiana Constitution Art. 1, § 23

Plaintiffs allege that Order 29-2020 violated the Indiana Constitution, Article 1, § 23 because it treated bars and nightclubs (which could open at 25% capacity indoors and 50% capacity outdoors) worse than other businesses.  [Filing No. 1-2 at 31.]  That section of the Indiana Constitution provides that "[t]he General Assembly shall not grant to any citizen, or class of

citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." IND. CONST. Art. 1, § 23. The Seventh Circuit has explained that "[w]hile this section of the Indiana Constitution bears similarities to the federal Equal Protection Clause, the Indiana Supreme Court has explained that it 'should be given independent interpretation and application.'" *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) (quoting *Collins v. Day,* 644 N.E.2d 72, 75 (Ind. 1994)). The Indiana Supreme Court has developed a two-step analysis. "For a law that provides preferential treatment to one class over another to pass constitutional muster, the disparate treatment must be (1) reasonably related to inherent characteristics which distinguish the relevant classes and (2) uniformly available to all persons similarly situated." *Id.* at 1075-76 (citing *Collins*, 644 N.E.2d at 78–80).

### b. Indiana Constitution Art. 1, § 21

Plaintiffs allege that Orders 22-2020, 25-2020, and 29-2020 violated the Indiana Constitution, Article 1, § 21 because these orders "took property from the Plaintiffs herein, without just compensation." [Filing No. 1-2 at 32.] The relevant portion of that provision provides that "[n]o person's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered." IND. CONST. Art. 1, § 21. Indiana courts construe and analyze this section of the Indiana Constitution the same as the Fifth Amendment Takings Clause in the U.S. Constitution. *Himsel v. Himsel*, 122 N.E.3d 935, 946 (Ind. Ct. App. 2019).

### c. Indiana Home Rule Act

Plaintiffs allege that Orders 22-2020, 25-2020, and 29-2020 violated the Indiana Home Rule Act, Ind. Code § 36-1-3-8, because the orders conflicted with laws enacted by the General

Assembly that entities with alcoholic beverage permits may sell alcohol every day from 7:00 a.m. until 3:00 a.m.  [Filing No. 1-2 at 32-33.]  Under the Home Rule Act, local governments have broad powers to control local affairs but may not "regulate conduct that is regulated by a state agency, except as granted by statute."  Ind. Code § 36-1-3-8(a)(7).  "Indiana courts have interpreted this provision, in light of the language and policy of the Home Rule Act as a whole, to mean that in areas regulated by state agencies, a local government may 'impose additional, reasonable regulations, and supplement burdens imposed by non-penal state law, provided the additional burdens are logically consistent with the statutory purpose.'"  *Fort Wayne Women's Health v. Bd. of Comm'rs, Allen Cty.*, 735 F. Supp. 2d 1045, 1051-52 (N.D. Ind. 2010) (quoting *Ind. Dep't of Natural Res. v. Newton Cty.,* 802 N.E.2d 430, 433 (Ind. 2004)) (alteration omitted).

### d.  Declaratory Judgment:  Separation of Powers under the Indiana Constitution

Plaintiffs also "seek a declaratory judgment that … Orders 22-2020, 25-2020, and 29-2020 are in violation of the Indiana Constitution under Article 1 § 21 (taking of property without just compensation), § 23 (equal privileges and immunities) and § 25 (takings effect clause), ARTICLE III § 1 (distribution of powers), and ARTICLE 4 § 1 (legislative authority vested in the General Assembly)."  [Filing No. 1-2 at 40.]  Plaintiffs do not elsewhere plead separate causes of action for alleged violations of these provisions of the Indiana Constitution.  Section 25 of Article 1 provides that "[n]o law shall be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this Constitution."  IND. CONST., Art. 1, § 25.  Section 1 of Article 3 states that the state government is "divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial," and that "no person charged with official duties under one of these departments shall exercise any of the functions of

another," except as otherwise delineated in the Indiana Constitution. IND. CONST., Art. 3, § 1. Finally, Section 1 of Article 4 identifies the General Assembly as having the legislative authority for the State and that "no law shall be enacted, except by bill." IND. CONST., Art. 4, § 1.

Although the Complaint is not clear, subsequent briefing suggests that Plaintiffs intend (although they did not so plead in the Complaint) to assert a claim that the code (Health & Hospital Code, Ch. 7, Art. 5) and state statute (Ind. Code § 16-20-1-24) under which Dr. Caine and the MCPHD issued the public health orders "are unconstitutional under Indiana's separation of powers and non-delegation principles." [*See* Filing No. 17 at 14.] Although "agencies may promulgate rules and regulations to implement the legislature's regulatory scheme, they are prohibited from adopting rules or regulations that are outside the scope of the power conferred by the legislature." *Tyus v. Indianapolis Power & Light Co.*, 134 N.E.3d 389, 406 (Ind. Ct. App. 2019). Furthermore, the delegation of authority to an agency must contain "reasonably certain" guidelines. *City of Carmel v. Martin Marietta Materials, Inc.*, 883 N.E.2d 781, 789 (Ind. 2008) (quoting *Steup v. Ind. Housing Fin. Auth.*, 402 N.E.2d 1215, 1227-28 (Ind. 1980)).

### e.  Orders Exceed Authority

Although not pled as a count or claim in Plaintiffs' Complaint,[8] Plaintiffs' subsequent filings make clear that they intend to assert a claim that the MCPHD's orders exceed the authority relied upon by the MCPHD in their issuance—Ind. Code § 16-20-1-24 (the "Epidemic Statute") and Health & Hospital Code, Ch. 7, Art. 5. [*See, e.g.*, Filing No. 15 at 2 (referring to the "improper application and enforcement" of the Epidemic Statute); Filing No. 17 at 9-10 (arguing that

---

[8] Because the parties have addressed this claim in the briefing on the Motion to Remand and the Motion for Preliminary Injunctive Relief, the Court addresses the claim.

Defendants exceeded the authority provided in the Epidemic Statute and the Health & Hospital

Code).]  The Epidemic Statute provides as follows:

> **16-20-1-24 Epidemic control; powers**
> (a) Local health officers may order schools and churches closed and forbid public
> gatherings when considered necessary to prevent and stop epidemics.
>
> (b) An individual who takes action under this section shall comply with state laws
> and rules.

Ind. Code § 16-20-1-24.  The Health & Hospital Code contains a similar provision:  "The Health

Officer may forbid public gatherings when considered necessary to prevent and stop the spread of

disease."       Health   &   Hospital   Code   § 7-505   ("§ 7-505"),   *available   at*

https://hhcorp.org/images/HHCcode/codechapter7.pdf (last accessed Dec. 21, 2020).  Plaintiffs

assert that neither the Epidemic Statute nor § 7-505 authorize the MCHPD and Dr. Caine to take

the actions contained in the orders as they relate to bars and nightclubs.

> ### 2.   *Section 1367(c)*

Plaintiffs primarily argue that the Court should exercise its discretion to remand the state-

law claims because the claims raise "novel" issues of state law under § 1367(c)(1) and because the

state-law claims "substantially predominate" over the federal claims under § 1367(c)(2).  The

Supreme Court has explained that a district court's decision to exercise supplemental jurisdiction

when a novel state-law claim is raised should be based on the "circumstances of the particular case,

the nature of the state law claims, the character of the governing state law, and the relationship

between the state and federal claims."  *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156,

173-74 (1997).  Furthermore, "when deciding whether to exercise supplemental jurisdiction, a

federal court should consider and weigh in each case, and at every state of the litigation, the values

of judicial economy, convenience, fairness, and comity." *Id.* at 173 (internal quotation marks and citation omitted).

Under § 1367(c)(1), a court may decline to exercise jurisdiction if a claim "raises a novel or complex issue of state law."  As referenced above, Indiana courts have developed significant bodies of law addressing claims under the Indiana Constitution and the Home Rule Act, and federal courts have analyzed whether government action violates the relevant provisions.  *See, e.g.*, *Goodpaster*, 736 F.3d at 1075-76 (analyzing IND. CONST. Art. 1, § 23); *Indus. Highway Corp. v. Gary Chicago Int'l Airport Auth.*, 2020 WL 6119523, at *2 (N.D. Ind. Oct. 16, 2020) (analyzing IND. CONST. Art. 1, § 21); *Fort Wayne Women's Health*, 735 F. Supp. 2d at 1051-52 (analyzing Home Rule Act).  As to the final claim regarding interpretation of the MCPHD's authority under the Epidemic Statute and the Health & Hospital Code, Plaintiffs contend that they were "unable to locate any legal precedent" interpreting the Epidemic Statute.  [Filing No. 12 at 6.]  While it is true that Indiana courts may not have had occasion to consider this particular statutory provision, they have provided ample guidance in how to interpret statutes.  For example, "[i]t is a general rule of statutory construction that undefined words and phrases in a statute are given their plain, ordinary and usual meaning. Courts may consult English language dictionaries to ascertain the plain and ordinary meaning of a statutory term." *Planned Parenthood of Indiana v. Carter*, 854 N.E.2d 853, 866 (Ind. Ct. App. 2006) (internal citation and quotation marks omitted).

Under § 1367(c)(2), a court may also decline to exercise supplemental jurisdiction where a state-law claim "substantially predominates" over the federal claims.  To determine whether a state-law claim "substantially predominates," courts look to "(1) whether a claim is purely a matter of state or local law and is therefore more properly entrusted to state courts, and (2) whether the federal claims are dependent on the resolution of the state claims." *Cox v. City of Indianapolis*,

2019 WL 2295465, at *3 (S.D. Ind. May 30, 2019) (quoting *Fowler*, 2010 WL 4291298, at *3).

"If it appears that the state issues substantially predominate, whether in terms of proof, of the scope

of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be …

left for resolution to state tribunals." *Id.* (quoting *Oszust v. Town of St. John*, 212 F. Supp. 3d 770,

781 (N.D. Ind. 2016)).

The Court finds that the state-law claims are not so novel or complex to warrant remanding

those claims to state court under § 1367(c)(1), nor do they "substantially predominate" to warrant

remand under § 1367(c)(2).  That Indiana courts have not squarely addressed the sections of the

Indiana Code and the Health & Hospital Code that Dr. Caine and the MCPHD cite as the basis for

their authority to issue the subject orders does not demand that this claim be severed and remanded

for determination by an Indiana court.  As discussed above, Indiana courts have provided ample

guidance regarding interpretation of state statutes.

Furthermore, Plaintiffs' federal and state-law claims rest on the same set of facts—namely,

an analysis of the orders issued by the MCPHD under relevant law—and the federal constitutional

claims are not dependent upon the resolution of the claims brought under the Indiana Constitution

and state law.  *See Cox*, 2019 WL 2295465, at *3.

Finally, the Court is mindful of the Supreme Court's admonition that when determining

whether to decline jurisdiction over a state-law claim, a court should consider "the values of

judicial economy, convenience, fairness, and comity." *Int'l Coll. of Surgeons*, 522 U.S. at 173

(internal quotation marks and citation omitted).  The Court finds that at this juncture, judicial

economy weighs against remanding the state-law claims to state court, especially in the midst of

an ongoing pandemic with ever-changing circumstances, because doing so would require the

parties to litigate the same facts in two separate forums.  Plaintiffs' argument that Defendants

created this multiple-forum issue by electing to remove this case cuts both ways and ignores Plaintiffs' own actions that brought about the risk that they could end up litigating their case in federal court —specifically, their decision to include federal claims in their Complaint.

Finding that the considerations weigh in favor of the Court continuing to exercise supplemental jurisdiction over Plaintiffs' state-law claims, the Court **DENIES** Plaintiffs' Motion to Remand.  [Filing No. 12].  However, the Court notes that it has an obligation "at every stage of the litigation" to consider whether it is appropriate to continue to exercise supplemental jurisdiction.  *See Int'l Coll. of Surgeons*, 522 U.S. at 173.  Future events may render the Court's continued exercise of jurisdiction over Plaintiffs' state-law claims inappropriate.  *See, e.g.*, 28 U.S.C. § 1367(c)(3) (noting a district court's discretion to decline supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction").

### III.
### MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs seek a preliminary injunction preventing Defendants from "enforcing … Order 33-2020 and any subsequent orders thereafter."   [Filing No. 17 at 8.]   A request to enjoin the enforcement of Order 33-2020 is now moot because that order was superseded by Orders 35-2020 and 38-2020.  Order 38-2020 is now the operative order, which this Court has judicially noticed under Fed. R. Evid. 201. Although the parties have not briefed this latest order, the issues and arguments raised by the parties in their briefing on Plaintiffs' Motion for Preliminary Injunctive Relief with respect to Order 33-2020 apply with equal force to Order 38-2020.

Although Plaintiffs plead other claims, the claims they assert as the basis for their request for a preliminary injunction are: (1) the MCPHD orders exceed the authority provided local health officers under the Epidemic Statute and the Health & Hospital Code; (2) the Epidemic Statute and

the Health & Hospital Code violate separation-of-powers principles set forth in the Indiana Constitution; and (3) the MCPHD orders violate the Indiana Home Rule Act.  [Filing No. 17 at 9-22; Filing No. 27 at 1 (explaining that for purposes of this motion, Plaintiffs are proceeding only on these three claims).]

### A.    Preliminary Injunction Standard

To obtain a preliminary injunction under Federal Rule of Civil Procedure 65, a plaintiff must establish that: "(1) without this relief, it will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of prevailing on the merits of its claims." *Mays*, 974 F.3d at 818 (internal quotations marks and citation omitted).  If a plaintiff meets this threshold showing, only then does the court proceed to a balancing analysis, "where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id.*  "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Id.  See also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) ("Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief.").  In addition, the granting of preliminary injunctive relief "is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou*, 549 F.3d at 1085 (internal quotation marks and citation omitted).  *See also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) (explaining that a preliminary injunction "is an extraordinary remedy" that "is never awarded as a matter of right").

**B.**       **Discussion**

*1. Likelihood of Success on the Merits*

"The likelihood of success on the merits is an early measurement of the quality of the underlying lawsuit." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). A plaintiff must demonstrate that "its claim has some likelihood of success on the merits . . ., not merely a better than negligible chance." *Mays*, 974 F.3d at 822 (internal citations and quotation marks omitted). "What amounts to 'some' depends on the facts of the case at hand because of [the] sliding scale approach." *Id.* The likelihood of success of each legal claim under which Plaintiffs proceed is addressed in turn below.

a.   <u>Order Exceeds Authority</u>

Plaintiffs contend that they are likely to succeed on their claim that Order 38-2020 exceeds the authority granted to Dr. Caine and the MCPHD under the Epidemic Statute and the relevant sections of the Health & Hospital Code. [Filing No. 17 at 9-13.] They argue that Dr. Caine has impermissibly used the following language of the Epidemic Statute—"forbid public gatherings when necessary to prevent and stop epidemics"—to "institute sweeping and restrictive regulations of every business in Marion County with no determinative end in sight." [Filing No. 17 at 10.] Plaintiffs argue that action undertaken pursuant to the Epidemic Statute must contain time limitations because the section following the Epidemic Statute in the Indiana Code that prohibits persons from "institut[ing], permit[ting], or maintain[ing] any conditions that may transmit, generate or promote disease" requires a health officer to order the abatement of such conditions within "the shortest reasonable time for abatement." [Filing No. 17 at 11 (citing Ind. Code § 16-20-1-25).] They also argue that reading various provisions within Chapter 7 of the Health &

Hospital Code (entitled "Communicable Disease") together demonstrates that "it was the legislature's intent that the Health Officer had the power to quarantine or restrict the potentially exposed, exposed and infected and seek cooperation for the least restrictive, medically necessary, procedures," and that the health orders run afoul of this intent because they "restrict the activities of every person in Marion County, regardless of whether they were exposed or not." [Filing No. 13 at 25.]

In response, Defendants Dr. Caine and the MCPHD[9] (collectively, the "MCPHD Defendants") argue that the restrictions in the health order at issue are within the statutory powers granted to them under the Epidemic Statute. They note that Plaintiffs do not dispute that Marion County continues to face an epidemic and that Plaintiffs offer no evidence that the challenged provisions are not necessary to control the epidemic. [Filing No. 26 at 8-9.] They further argue that the question of "how long and to what extent" Dr. Caine can exercise her power under the Epidemic Statute "is answered within the text of the statute itself: MCPHD can forbid public gatherings as long as necessary to prevent and stop an epidemic." [Filing No. 26 at 9.] The MCPHD Defendants also argue that the order complies with the provision of the Health & Hospital Code addressing public gatherings—§ 7-505—and Plaintiffs' citation to other provisions in the Code is inapplicable. [Filing No. 26 at 10-11.]

Plaintiffs reply that they are not contesting the fact and nature of the pandemic, [Filing No. 27 at 1], but they reiterate that the MCPHD Defendants have acted outside the scope of their statutory authority, [Filing No. 27 at 2-5].

---

[9] Defendants City of Indianapolis and Mayor Hogsett did not file a response to Plaintiffs' Motion for Preliminary Injunctive Relief, nor did they seek to join in the response filed by the MCPHD Defendants.

"It is elementary that the authority of the State to engage in administrative action is limited to that which is granted it by statute." *Ind. State Bd. of Pub. Welfare v. Tioga Pines Living Ctr., Inc.*, 622 N.E.2d 935, 939 (Ind. 1993). The Epidemic Statute reads as follows:

> **16-20-1-24 Epidemic control; powers**
> (a) Local health officers may order schools and churches closed and forbid public gatherings when considered necessary to prevent and stop epidemics.
>
> (b) An individual who takes action under this section shall comply with state laws and rules.

Ind. Code § 16-20-1-24. The Health & Hospital Code cited by the MCPHD Defendants—§ 7-505—provides similar language: "The Health Officer may forbid public gatherings when considered necessary to prevent and stop the spread of disease." If the language of a statute is "clear and unambiguous," Indiana courts[10] "give the words and phrases of the statute their plain, ordinary, and usual meanings to determine and implement the legislature's intent." *D.B. v. Review Bd. of Indiana Dep't of Workforce Dev.*, 2 N.E.3d 705, 709-10 (Ind. Ct. App. 2013). "The first step in interpreting a statute is to determine whether the Legislature has spoken clearly and unambiguously on the point in question." *City of Carmel v. Steele*, 865 N.E.2d 612, 618 (Ind. 2007). And, "[w]hen a statute is clear and unambiguous, [Indiana courts] need not apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense." *Id.*

Here, the Epidemic Statute states that "[l]ocal health officers may . . . forbid public gatherings when considered necessary to prevent and stop epidemics." Ind. Code § 16-20-1-24(a). In taking such actions, the local health officer must "comply with state laws and rules." Ind. Code

---

[10] "In construing a state statute, we must interpret the statute as we think the state's highest court would interpret it." *Frye v. Auto-Owners Ins. Co.*, 845 F.3d 782, 786 (7th Cir. 2017).

§ 16-20-1-24(b).  The plain text of the statute provides that Dr. Caine, as a "local health officer," has the authority to forbid public gatherings.  The plain, ordinary, and usual use of the word "public" is "participated in or attended by the people or community," and "gathering" means "an assembly of persons; a meeting."  "Public" and "Gathering," The American Heritage Dictionary, *available at* www.ahdictionary.com (last accessed Dec. 21, 2020).  *See also Naugle v. Beech Grove City Schs.*, 864 N.E.2d 1058, 1068 (Ind. 2007) ("Courts may properly consult English dictionaries to determine the plain and ordinary meaning of words.").  Thus, the congregation of employees and customers at bars and nightclubs constitutes a public gathering within the meaning of the Epidemic Statute.  Plaintiffs do not dispute that COVID-19 constitutes an "epidemic."[11] Thus, on its face, the plain meaning of the Epidemic Statute affords Dr. Caine the authority to restrict gatherings at bars and nightclubs because of the COVID-19 pandemic.

The same is true for § 7-505, which contains identical language to the Epidemic Statute except that it replaces "epidemic" with "the spread of disease."  Plaintiffs do not argue that COVID-19 does not constitute a disease.

Plaintiffs take issue with the indefinite nature of the order and contend that this aspect exceeds the authority provided in the Epidemic Statute.  [*See* Filing No. 17 at 10 ("Dr. Caine has used the language of the statute … for authority to institute sweeping and restrictive regulations … with no determinative end in sight.").]  However, there is no explicit temporal limitation in terms of days, weeks, or months in the Epidemic Statute, and, as the MCPHD Defendants correctly

---

[11]  COVID-19 is a pandemic, which is more widespread than an epidemic.  *See* https://www.cdc.gov/coronavirus/2019-nCoV/cases-updates/about-epidemiology/identifying-source-outbreak.html (last accessed Dec. 21, 2020).

note, the language of the statute itself limits the health officer's authority to limit public gatherings to only "when considered necessary to prevent and stop epidemics." Ind. Code § 16-20-1-24(a).

Plaintiffs also argue that "Dr. Caine's interpretation [of the Epidemic Statute] is in derogation of [Ind. Code §] 16-20-1-24(b), which states, 'An individual who takes action under this section shall comply with state laws and rules.'" [Filing No. 17 at 10] (emphasis omitted).] Plaintiffs then contend that Order 38-2020 "clearly contradicts the Home Rule and state statutes regulating the hours alcohol may be served." [Filing No. 27 at 3.] However, Plaintiff's make their argument without addressing the power afforded the local health officer under the Epidemic Statute, and, in any event, as discussed more thoroughly below, the Epidemic Statute does not conflict with the state statute regulating alcoholic beverage sales.

Plaintiffs also argue that if the Court finds the Epidemic Statute "to be ambiguous, then … a review of [Ind. Code §] 16-20-1-25, [the statute immediately following the Epidemic Statute in the Indiana Code], informs of the legislature's intent of the extent of the powers intended to be delegated to the health officer." [Filing No. 17 at 5.] First, Plaintiffs have not identified an ambiguity in the text of the Epidemic Statute, and as discussed above, the Court finds that there is no ambiguity. Second, Ind. Code § 16-20-1-25 does not address epidemics; rather, it forbids a person from "insitut[ing], permit[ting], or maintain[ing] any conditions that may transmit, generate, or promote disease" and requires the health officer to "order the abatement of those conditions" by issuing an order naming "the shortest reasonable time for abatement." Ind. Code § 16-20-1-25(a)-(b).  This statute has no relevance to a health officer's authority under the Epidemic Statute.  If anything, this section supports the MCPHD Defendants because this section concerning abating unhealthy property conditions demonstrates the legislature's intent that local health officers act swiftly to remediate unhealthy disease-promoting conditions.  That section also

27

demonstrates that the legislature is able to instruct local health officers with respect to time constraints in which to act, and the legislature chose not to do so in the Epidemic Statute.

Plaintiffs also attack the MCPHD's authority under § 7-505, which allows a health officer to "forbid public gatherings when considered necessary to prevent and stop the spread of disease," by pointing to other sections of the Health & Hospital Code that address circumstances not applicable here.  [Filing No. 17 at 12-13.]  They argue that "other pertinent portions of the Code in Chapter 7 shows that the Health Officer's powers of 'quarantine' and 'restriction of activities' apply only to people who have or may have been exposed or persons with disease or infection." [Filing No. 17 at 12 (citing §§ 7-112, 7-113, 7-502, 7-503, and 7-506 of the Health & Hospital Code) (emphasis omitted).]  They argue that § 7-505's power to forbid public gatherings should be read to limit its application to only those individuals who have an active infection or who have confirmed exposure to a communicable disease.  However, the plain, unambiguous language of § 7-505 is not so limited.

Plaintiffs also insinuate—but do not directly argue—that the restrictions imposed on bars and nightclubs by Order 38-2020 are not "necessary to prevent and stop epidemics."  [*See* Filing No. 17 at 12 (arguing that the MCPHD Defendants are interpreting the Epidemic Statute to permit Dr. Caine to issue orders "even if there is no shred of proof or particularized conduct that is potentially spreading the disease").]  However, Plaintiffs—the parties seeking the injunction— offer no evidence that the restrictions are not "necessary to prevent and stop epidemics."  Plaintiffs bear the burden of proof and have offered no evidence on this front.  *See Taylor v. Biglari*, 971 F. Supp. 2d 847, 852 (S.D. Ind. 2013).  Furthermore, information from the CDC has identified social distancing and limiting gatherings as crucial to reducing the spread of COVID-19.  *See, e.g.*, CDC, "Consideration     for     Events     and     Gatherings,"     https://www.cdc.gov/coronavirus/2019-

ncov/community/large-events/considerations-for-events-gatherings.html (last accessed Dec. 21, 2020) ("The more people an individual interacts with at a gathering and the longer that interaction lasts, the higher the potential risk of becoming infected with COVID-19 and COVID-19 spreading.")

In sum, the plain text of both the Epidemic Statute and § 7-505 provide the MCPHD Defendants the authority to limit gatherings at bars and nightclubs as set forth in Order 38-2020, and Plaintiffs have offered no evidence or argument that the circumstances for exercising such authority have not been met, nor that the limitations in Order 38-2020 are not necessary to prevent the spread of COVID-19.   Therefore, Plaintiffs have not met their burden to establish some likelihood of success on the merits of this claim.

b.   Separation of Powers

Plaintiffs next contend that if the Court determines that Order 38-2020 was issued pursuant to the authority granted under the Epidemic Statute and the Health & Hospital Code, they are nonetheless likely to succeed in showing that these laws are unconstitutional because they violate separation-of-powers and non-delegation principles set forth in the Indiana Constitution.   [Filing No. 17 at 14.]   They argue that the Indiana General Assembly impermissibly delegated to local health authorities the power to make law because the Epidemic Statute and § 7-505 lack sufficient standards.   [Filing No. 17 at 15-16.]

The MCPHD Defendants respond by first noting that Indiana courts afford its statutes "a presumption of constitutionality until clearly overcome by a contrary showing."   [Filing No. 26 at 11-12 (quoting *Boehm v. Town of St. John*, 675 N.E.2d 318, 321 (Ind. 1996)).]   With that standard as a backdrop, they argue that the Epidemic Statute and § 7-505 do not offend separation-of-

powers principles because both provisions contain the required reasonably certain guidance and because the MCPHD acted within the parameters of that guidance.  [Filing No. 26 at 12-15.]

Plaintiffs reply by reiterating their arguments that if the MCPHD Defendants did act within the scope of their authority, then the Epidemic Statute and § 7-505 impermissibly violate the Indiana Constitution's separation-of-powers doctrine because those provisions "place no limitations on the power of the health official."  [Filing No. 27 at 7.]

"[T]he legislature cannot delegate the power to make a law."  *City of Carmel*, 883 N.E.2d at 788 (construing article IV, section 1 of the Indiana Constitution).  It can, however, "make a law delegating power to an agency to determine the existence of some fact or situation upon which the law is intended to operate."  *Id.* (internal quotations omitted).  The delegation of such power must be "accompanied by sufficient standards to guide the agency in the exercise of its statutory authority."  *Healthscript, Inc. v. State*, 770 N.E.2d 810, 814 (Ind. 2002).  These standards "only need to be as specific as the circumstances permit, considering the purpose to be accomplished by the statute."  *Barco Beverage Corp. v. Ind. Alcoholic Beverage Comm'n*, 595 N.E.2d 250, 254 (Ind. 1992) (internal quotation marks, citation, and alteration omitted).

In *City of Carmel*, the Indiana Supreme Court found that the city council did not impermissibly delegate its law-making powers to a city executive.  883 N.E.2d at 789.  The court reaffirmed the concept that the reasonably certain standards for an agency are often informed by the agency itself as the subject-matter expert:

> [T]he policy of the Legislature and the standards to guide the administrative agency may be laid down in very broad and general terms. Such terms get precision from the knowledge and experience of [persons] whose duty it is to administer the statutes, and then such statutes become reasonably certain guides in carrying out the will and intent of the Legislature.

*Id.* at 788-89 (quoting *Matthews v. State*, 148 N.E.2d 334, 336 (1958) (alterations original)).

Likewise, in *Barco Beverage*, plaintiffs challenged a rule promulgated by Indiana's Alcoholic Beverage Commission that prohibited wholesalers from restricting the sale or resale of their products to a given geographical area in the state.  595 N.E.2d at 251.  The statute authorizing the commission to issue the rule provided that "the commission shall have the power to promulgate rules and regulations governing . . . [t]he conduct of the business of a permittee authorized or governed by the provisions of this title," as well as "all powers necessary and proper to carry out the policies of this title and to promote efficient administration by the commission." *Id.*  In finding that the statutes did not violate separation-of-powers principles, the Indiana Supreme Court cited the purpose clauses of Indiana's alcoholic beverage statute, which expressed an intent "(a) to protect the economic welfare, health, peace and morals of the people of this state; (b) to regulate and limit the manufacture, sale, possession, and use of alcohol and alcoholic beverages; and, (c) to provide for the raising of revenue." *Id.*  The court found that the commission's geographic restrictions were consistent with these state goals.  *Id.*

Here, the Epidemic Statute and § 7-505 provide sufficient guidance to local health officers. The Epidemic Statute empowers the health officer to "forbid public gatherings" when the health officer finds doing so "necessary to prevent and stop epidemics" (or "the spread of disease" in the case of § 7-505).  Ind. Code § 16-20-1-24(a); Health & Hospital Code § 7-505.  The General Assembly has authorized local health officers to make the factual determination of when forbidding gatherings is necessary to prevent an epidemic.  And the manner by which the health officer forbids public gatherings obtains "precision from the knowledge and experience" of the health officer "whose duty it is to administer the statutes." *See City of Carmel*, 883 N.E.2d at 788-89 (quoting *Matthews*, 148 N.E.2d at 336).  Although Plaintiffs offer neither argument nor evidence to the contrary, Order 38-2020 is presumably informed by the manner by which COVID-

19 spreads in the community. *See, e.g.*, CDC, "Preventing the Spread of COVID-19 in a Variety of Settings Throughout Your Community," https://www.cdc.gov/coronavirus/2019-ncov/php/open-america/infection-control.html (last accessed Dec. 21, 2020) ("The most common way to catch the virus that causes COVID-19 is from close contact with other people.  Avoiding gatherings of people and practicing social distancing can help reduce the chances of exposure to the virus.").  It would be difficult for the legislature to imagine every type and nature of disease that might befall its citizenry, and therefore the legislature has reasonably left the precise method by which to limit public gatherings to the expertise of the health officer.  Furthermore, the purpose of the statute—to prevent and stop an epidemic, which by definition is "[a]n outbreak of a contagious disease that spreads rapidly and widely"—cannot be overlooked. *See* "Epidemic," The American Heritage Dictionary, *available at* www.ahdictionary.com (last accessed Dec. 21, 2020). To require the legislature to delineate every manner by which a local health officer may limit public gatherings to respond to a given epidemic—especially a new disease—would frustrate the purpose of the Epidemic Statute.

Within their separation-of-powers claim, Plaintiffs once again argue that the MCPHD Defendants' orders exceeded their statutory authority and are therefore "*ultra vires* and void." [Filing No. 17 at 16.]  This is a repackaged argument concerning the statutory authority granted to local health officers during an epidemic, which the Court has discussed above.  The MCPHD Defendants acted within the authority granted to them by the Epidemic Statute and § 7-505.

In summary, the Epidemic Statute and § 7-505 provide sufficient guidance to local health officers, and therefore Plaintiffs have not established that they have some likelihood of success on their separation-of-powers claim under the Indiana Constitution.

c. <u>Home Rule Act</u>

Plaintiffs allege that Order 38-2020 violates the Indiana Home Rule Act, Ind. Code § 36-1-3-8, because it conflicts with laws enacted by the General Assembly that allow the holders of alcoholic beverage permits to sell alcohol every day from 7:00 a.m. until 3:00 a.m. [Filing No. 17 at 19.] Plaintiffs argue that because the public health order restricts bars and nightclubs from staying open past midnight, it is "in direct contravention" of the laws permitting alcohol sales until 3:00 a.m. [Filing No. 17 at 19.]

The MCPHD Defendants argue that the order was issued pursuant to the Epidemic Statute and § 7-505, which "do[]n't regulate alcohol or alcohol permits; [they] allow[] public health officers to limit public gatherings." [Filing No. 26 at 21.] They further argue that both sets of provisions—the Epidemic Statute and § 7-505 on the one hand and the statute permitting alcoholic beverages to be sold until 3:00 a.m. on the other—can be read together to "produce a harmonious statutory scheme that gives effect to both statutes." [Filing No. 26 at 20.] They argue that the Epidemic Statute "applies only in narrow circumstances" and therefore controls against the backdrop of the 3:00 a.m. statute. [Filing No. 26 at 21-22.]

Plaintiffs reply that subsection (b) of the Epidemic Statute, which provides that "[a]n individual who takes action under this section shall comply with state laws and local rules," means that the Epidemic Statute must be read as subordinate to any other statute that might pose any conflict. [Filing No. 27 at 8.] Therefore, Plaintiffs argue, "the statute has not authorized MCPHD to enact public health orders that restrict the hours alcohol can be served.  In fact, it has mandated the opposite." [Filing No. 27 at 8.] They also argue that while the public health order may not be aimed at regulating alcohol, the complained-of provision is directed to restaurants, bars,

nightclubs, and retail food establishments, and such establishments that serve alcohol are likely to be open after midnight.  [Filing No. 27 at 9.]

Under the Home Rule Act, a unit[12] has "(1) all powers granted it by statute; and (2) all other powers necessary or desirable in the conduct of its affairs, even though not granted by statute."  Ind. Code § 36-1-3-4(b).  The net result is that "a unit may exercise any power it has to the extent that the power: (1) is not expressly denied by the Indiana Constitution or by statute; and (2) is not expressly granted to another entity."  Ind. Code § 36-1-3-5(a).  However, the Home Rule Act expressly denies units "[t]he power to regulate conduct that is regulated by a state agency, except as granted by statute."  Ind. Code § 36-1-3-8(a)(7).  "'Regulate' includes license, inspect, or prohibit."  Ind. Code § 36-1-2-15.  The Indiana Supreme Court has construed the Home Rule Act broadly, stating "[w]e believe this statutory scheme demonstrates a legislative intent to provide counties, municipalities, and townships with expansive and broad-ranging authority to conduct their affairs."  *City of Carmel*, 883 N.E.2d at 784 (quoting *City of North Vernon v. Jennings Nw. Reg'l Utils.*, 829 N.E.2d 1, 5 (Ind. 2005)).

Plaintiffs allege that the hours-of-operation restriction in Order 38-2020 conflicts with Ind. Code § 7.1-3-1-14, which provides, in relevant part:

(a) Except as otherwise specifically provided in this title, an appropriate permittee may sell alcoholic beverages each day Monday through Sunday from 7 a.m., prevailing local time, until 3 a.m., prevailing local time, the following day.

(b) The holder of a retailer's permit may sell the appropriate alcoholic beverages as follows: . . . Monday through Sunday from 7 a.m., prevailing local time, until 3 a.m., prevailing local time, the following day, the holder of a retailer's permit may sell the appropriate alcoholic beverages for consumption on the licensed premises.

---

[12] "Unit" is defined as a "county, municipality, or township."  Ind. Code § 36-1-2-23.

Ind. Code § 7.1-3-1-14.  Order 38-2020 provides: "All restaurants, bars, nightclubs, and retail food establishments must be closed and cleared of all customers between the hours of 12:00 AM and 5:00 AM nightly."  Order 38-2020 at p. 5, available at http://marionhealth.org/homeslider/latest-on-coronavirus/ (last accessed Dec. 21, 2020).

"Indiana courts have interpreted [Ind. Code § 36-1-3-8(a)(7)], in light of the language and policy of the Home Rule Act as a whole, to mean that in areas regulated by state agencies, a local government may 'impose additional, reasonable regulations, and supplement burdens imposed by non-penal state law, provided the additional burdens are logically consistent with the statutory purpose.'"  *Fort Wayne Women's Health*, 735 F. Supp. 2d at 1051-52 (quoting *Ind. Dep't of Natural Res.,* 802 N.E.2d at 433) (alteration omitted).  Thus, it is not enough that a state agency regulate a field heavily, but "to be in 'conflict' within the meaning of the Home Rule Act the ordinance must be precise in its contravention of statutory . . . mandate or it must otherwise frustrate the policies found in state laws." *Id.* at 1054.

A district court in this Circuit considered a nearly identical Home Rule Act claim to the claim Plaintiffs advance here.  In *BBL, Inc. v. City of Angola*, 2014 WL 26093 (N.D. Ind. Jan. 2, 2014), the plaintiff argued that a local ordinance which required sexually oriented businesses to close at midnight violated the Home Rule Act because Ind. Code § 7.1-3-1-14 permits alcohol to be served until 3:00 a.m. *Id.* at *10.  The court found that the ordinance did not run afoul of the Home Rule Act because the ordinance regulated sexually oriented businesses, not alcohol, noting that "[t]he ordinance doesn't restrict the operation of the liquor retail permit holder's business in any way with respect to the sale of alcohol or liquor, and the ordinance doesn't affect the liquor retail permit itself." *Id.* at *11.  The court also found that the alcoholic beverage statutes and the ordinance "share a goal of protecting the public's health and, in general, the welfare of citizens . .

35

. . Nothing in the Angola ordinance's purpose conflicts with the alcoholic beverage statutes' general purpose." *Id.*

Like the ordinance at issue in *BBL*, Order 38-2020 does not seek to regulate alcohol or the licensing of the sale of alcoholic beverages. Rather, it regulates conditions that promote the spread of disease by prohibiting public gatherings. Furthermore, the hours-of-operation restriction in Order 38-2020 are not in "direct" contravention of Ind. Code § 7.1-3-1-14 because it is possible to comply with both regulations. *See Fort Wayne Women's Health*, 735 F. Supp. 2d at 1052-54 (reviewing Indiana case law establishing that conflict requires a "direct" contravention). A direct contravention would *require* the establishments to remain open until 3:00 a.m., not merely permit them to do so. Instead, the midnight restriction "impose[s] an additional, reasonable regulation[], and supplement[s] [Plaintiffs'] burdens." *See id.* at 1052. Finally, Order 38-2020 is consistent with Indiana's alcoholic beverage statutes' purpose to protect the public's health. *See* Ind. Code § 7.1-1-1-1.

Plaintiffs' contention that subsection (b) of the Epidemic Statute, which requires the health officer to "comply with state laws and rules," somehow alters the analysis is not supported by any case law. Furthermore, as discussed above, the midnight restriction is not in direct contravention of any state laws identified by Plaintiffs. Therefore, the Court finds that Plaintiffs' have not met their burden to establish that they have some likelihood of success on the merits of their Home Rule Act claim.

Having concluded that Plaintiffs have failed to meet the threshold requirement to establish that they are likely to succeed on the merits of the three legal claims they cite in their Motion for Preliminary Injunction, the Court must deny the injunction. *See GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). Nevertheless, the Court is mindful of the Seventh

Circuit's preference that district courts provide analysis of each requirement of the preliminary-injunction standard to expedite the Circuit's review on appeal, so the Court addresses the remaining requirements in turn. *See Girl Scouts of Manitou*, 549 F.3d at 1087.

### 2.   Adequacy of Remedies at Law

As to the second preliminary-injunction requirement, Plaintiffs "fear … having to shut down should these restrictions continue," before any money damages might be awarded. [Filing No. 17 at 22.] Plaintiffs cite numerous affidavits in which their owners and operators state that the ongoing capacity and hour restrictions harm their businesses. [*See* Filing No. 1-2 at 44-82.]

The MCPHD Defendants argue that Plaintiffs may be able to recover money damages for the claims they assert under 42 U.S.C. § 1983 for alleged violations of the United States Constitution, which are not the subject of the Motion for Preliminary Injunction. [Filing No. 26 at 25.] Furthermore, the MCPHD Defendants contend that Plaintiffs have not established that they will suffer damages under the most current order that allows for Plaintiffs to open during reduced hours and at reduced capacity, contending that "Plaintiffs' affidavits focus on revenue lost during the initial [complete] closure of non-essential businesses." [Filing No. 26 at 25.]

Plaintiffs reply that it is not clear that they will prevail on their § 1983 claims and therefore money damages may not be available to them. [Filing No. 27 at 12.] Furthermore, they contend that "any damages that may be recovered will likely not be in time to keep Plaintiffs' businesses from closing." [Filing No. 27 at 12.]

Generally, a plaintiff seeking a preliminary injunction must "demonstrate that traditional legal remedies, *i.e.*, money damages, would be inadequate." *Girl Scouts of Manitou*, 549 F.3d at 1095. "A damages remedy need be 'seriously deficient,' but not 'wholly ineffectual'" in order to be inadequate. *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir.

1984)).  One instance where money damages are insufficient is "when a damages award may come too late to save the plaintiff's business."  *Id.*

As Indiana enters the cold winter season, Order 38-2020 limits Plaintiffs' indoor capacity to 25% and requires closure by midnight.  The COVID-19 pandemic has called upon public health officials to make difficult choices in the face of a deadly virus, and bars and restaurants have been among the industries most devasted financially by the virus.  Plaintiffs undoubtedly will continue to suffer the financial consequences outlined in their affidavits as a result of being limited to 25% capacity.  Indeed, the Court acknowledges that it is possible that any potential damages award "may come too late to save [their] business."  *See Girls Scouts of Manitou*, 549 F.3d at 1095.

However, on the record currently before this Court, Plaintiffs have fallen short of their burden of proof on this requirement for a preliminary injunction.  Plaintiffs offer affidavits from their owners and operators about the financial hardships they have experienced in the past.  For example, Plaintiff Bar Indy LLC's owner testifies that "[a]s a result of the pandemic and subsequent orders of the Defendants," the businesses operated by Bar Indy LLC "estimate that they have lost over $1,500,000 in irreplaceable revenue" and that "[b]ills from rent, utilities, and overhead are depleting all cash revenues of the business, as revenue has stopped" and the orders issued by the MCPHD Defendants "have severely impacted their generation of revenue."  [Filing No. 1-2 at 44-45.]  Tom Sutton, the owner of Plaintiff Isentark Entertainment, LLC states that "[a]s a result of the pandemic and subsequent orders of the Defendants," the bar operated by Isentark Entertainment, LLC has "lost over $300,000 in revenue from March 1st until May 31st, during the total business shutdown" and "estimates that [it] has lost $200,000 in revenue from May 31st to September due to current COVID-19 restrictions on limited capacity and the enforcement of no bar seating," such that it "is facing severe debt and financial hardship" absent an injunction.  [Filing

No. 1-2 at 47.] The owner of Classic 46, Inc. states that "[a]s a result of the pandemic and subsequent orders of the Defendants," its "sales are down by 65% from last year due to restrictions of capacity," and "the 25% capacity that they are limited to now has further crippled [its] finances" such that "[w]ithout immediate relief, [it is] merely waiting for permanent closure." [Filing No. 1-2 at 59.] Plaintiff TAD Indy Inc. owns and operates Taps and Dolls, After 6 Lounge, Jokers Comedy Club, and 247 Sky Bar, and its owner states that these businesses "have suffered extreme losses to their financial revenue. They were unable to generate any revenue during their five months of closure due to the mandate. Currently, they are only able to operate at 25% and fear they will not be able to financially recover." [Filing No. 1-2 at 62.] The owners of each Plaintiff have testified to similar plights and the hardships that they have undoubtedly faced as a result of COVID-19 and the corresponding measures taken by public officials to stop the spread. [*See generally* Filing No. 1-2 at 44-82.]

The likely closure of a business during the pendency of litigation can result in a finding of an inadequate remedy at law. *See Girls Scouts of Manitou*, 549 F.3d at 1095. However, Plaintiffs have not provided the quantity or quality of evidence necessary for the Court to make such a finding here. Plaintiffs do not provide the kind of specific financial data about their business operations that would enable the Court to find that money damages will be inadequate. The affidavits submitted by Plaintiffs detailing their hardships and opining that they believe that their businesses may fail—are too thin under the more demanding standards imposed by the law. *Cf. Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (finding that with respect to irreparable harm, the "possibility" of irreparable harm is too uncertain to warrant the extraordinary relief afforded by an injunction). This finding does not mean that the Court does not credit the testimony of Plaintiffs' owners and operators. To the contrary, the Court fully accepts and credits

the testimony in the affidavits and finds that Plaintiffs have faced and continue to face financial hardship because of the public health orders.  However, the law demands a more exacting proof, especially in the context of speculative outcomes. Accordingly, Plaintiffs have not carried their burden to establish that they have no adequate remedy at law based on potential future insolvency.

### 3.  *Irreparable Harm*

Pointing to the affidavits submitted by Plaintiffs' owners and operators, Plaintiffs argue that the "the economic harm of shutdowns and capacity restrictions have had a devastating effect on Plaintiffs' businesses." [Filing No. 17 at 22.]  They say that "[f]urther capacity limitations and restrictions are only adding to the lost revenue" and that [m]any of the Plaintiffs are in fear of having to shut down should these restrictions continue." [Filing No. 17 at 22.]

In response, the MCPHD Defendants contend that Plaintiffs have not established that they will suffer irreparable harm under the most current order that allows for Plaintiffs to open at reduced capacity and contend that "Plaintiffs' affidavits focus on revenue lost during the initial closure of non-essential businesses." [Filing No. 26 at 25.]  They say that Plaintiffs have not provided sufficient evidence of financial impact of the current order and instead "speak only in general terms about the capacity and hour restrictions." [Filing No. 26 at 26.]  They also say that lost revenue alone is insufficient to establish irreparable harm. [Filing No. 26 at 26.]

In reply, Plaintiffs cite the affidavits addressing financial hardship submitted by their owners and operators. [Filing No. 27 at 10-12.]  They contend that lost revenue is sufficient to establish irreparable harm when Plaintiffs may be forced to close prior to trial. [Filing No. 27 at 12.]

The moving party must demonstrate that it "will likely suffer irreparable harm absent obtaining preliminary injunctive relief." *Whitaker*, 858 F.3d at 1044-45 (citing *Michigan*, 667

40

F.3d at 787).  Regarding whether a harm is "likely," the Seventh Circuit has explained that a showing of likelihood "requires more than a mere possibility of harm. It does not, however, require that the harm actually occur before injunctive relief is warranted. Nor does it require that the harm be certain to occur before a court may grant relief on the merits." *Id.* at 1045 (citations and quotations omitted).  The Supreme Court has cautioned that issuing a preliminary injunction "based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Like the second requirement concerning the adequacy of remedies at law, Plaintiffs also face an evidentiary shortfall with respect to irreparable harm.  Plaintiffs have only offered generalized statements about the economic harms that they undoubtedly have suffered as a result of COVID-19.  However, they do not offer the particularized analysis concerning the limitations of the current health order or the requisite financial details to enable the Court to find that they have met their burden to establish irreparable harm—*i.e.*, that a business closure will occur prior to trial under the current restrictions.  *See Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 543 (E.D.N.C. 2020) (finding no irreparable harm where plaintiffs put forth insufficient evidence to substantiate assertion that COVID-19 restrictions would result in closure of businesses).  Accordingly, Plaintiffs have failed to meet their burden to establish irreparable harm.

### 4.  *Balancing of Harms*

Even if Plaintiffs had met their burden on their threshold requirements for a preliminary injunction, the Court nevertheless finds that an analysis at the second stage results in a finding that the public interest weighs against granting Plaintiffs an injunction.  At stake is the health and welfare of the residents of Marion County where, as discussed previously, more than 1,000 people

have died from COVID-19 in less than a year.  Tens of thousands more have contracted COVID-19 and fallen ill during that time.  And, as noted previously in this Order, the restrictions imposed by the public-health order follow the recommendations from the CDC on how to mitigate community spread of the disease—namely, by limiting gatherings of people who are not part of the same household.  Enjoining the measures in Order 38-2020 would harm the public's great interest in preventing the spread of a highly contagious and dangerous disease, especially during a period when case numbers and deaths are climbing at a significant rate.  The potential harm to the public overwhelms the harms that Plaintiffs undoubtedly face.  Thus, even if Plaintiffs had shown some likelihood of success and had met their burden of proof as to irreparable harm and the inadequacy of remedies at law, the balance of harms weighs so heavily against them as to preclude the requested relief.

In sum, Plaintiffs have not met their legal burden to enable the Court to grant them the "extraordinary and drastic remedy" of a preliminary injunction.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Therefore, Plaintiffs' Motion for Preliminary Injunction is **DENIED**. [Filing No. 17.]

### IV.
#### CONCLUSION

The COVID-19 pandemic has affected nearly every person and business this this country over the last nine months, and this case presents a stark example of its devastating effects.  The Court is indeed sympathetic to the hardships that the COVID-19 restrictions have placed on Plaintiffs, and this ruling in no way diminishes those hardships.  The Court also recognizes the difficulties faced by public health officials charged with protecting the public health during these unprecedented times.  That said, Plaintiffs have not presented a legal basis for the issuance of a

preliminary injunction enjoining the restrictions placed upon them by Order 38-2020.  For the

reasons discussed in this Order, Plaintiffs' Motion to Remand, [12], is **DENIED**, and Plaintiffs'

Motion for Preliminary Injunctive Relief, [17], is **DENIED**.

Date: 12/22/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**